IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DIVINE EQUALITY RIGHTEOUS, ANGELINA LEE, NYOKA E. JONES, TAMEEKA HOLLAND, ARKEEM DUNSON, AND SOPHIA YAZUJIAN,** <br> **Plaintiffs,** <br><br> v. <br><br> **OVERBROOK SCHOOL FOR THE BLIND,** <br> **Defendant.** | **CIVIL ACTION** <br><br><br><br> **NO. 23-846** |

## MEMORANDUM OPINION

During the COVID-19 pandemic, Defendant Overbrook School for the Blind ("Overbrook") required its employees to get vaccinated for COVID-19. Each Plaintiff—Divine Equality Righteous, Angelina Lee, Nyoka E. Jones, Tameeka Holland, Arkeem Dunson, and Sophia Yazujian—all employees of Overbrook—requested but were denied a religious exemption from the vaccine mandate. When Plaintiffs, nevertheless, refused to get vaccinated, Overbrook fired them.

Plaintiffs sued Overbrook for religious discrimination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*[1] Overbrook moves to exclude Plaintiffs' proposed expert, Dr. Richard Scott French, Fed. R. Civ. P. 702, and for summary judgment on Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 56

---

[1] In addition to Plaintiffs' religious discrimination claims, their Third Amended Complaint also alleged race discrimination claims under Title IV and the PHRA. But in their briefing, Plaintiffs abandoned those claims.

1

## I.  FACTUAL BACKGROUND[2]

Except as otherwise noted, the following facts are not in dispute.

Overbrook is a private school for blind students in Philadelphia, Pennsylvania.  During the relevant period, Plaintiffs worked for Overbrook as either paraeducators or in the school's kitchen.  The five who were paraeducators (Divine Equality Righteous, Angelina Lee, Nyoka E. Jones, Tameeka Holland, and Arkeem Dunson) worked in close contact with students, often sitting directly next to them when helping with their schoolwork, including assisting students with their braillers, or helping them with their computers.  In addition to those educational objectives, Overbrook staff also frequently assists students with various personal activities like bathing, changing clothes, eating, and using the bathroom.

In 2020, with COVID-19 rampant, Overbrook leadership created a "Pandemic Crisis Response Team," which engaged with the Pennsylvania Department of Education and the Philadelphia Department of Public Health with regard to how to respond to the pandemic.  With guidance from the Philadelphia Department of Health, Overbrook created and published to its staff a "Health and Safety Plan."

The Plan anticipated a return back to in-person instruction—contingent on certain local health metrics—with layers of protection in place, *e.g.*, guidance that employees should wash their hands and wear masks, that dividers would section up classrooms, that new air filtration systems would be installed throughout the School, and that there would be periodic deep cleaning of its classrooms.  Despite the Plan's implementation, Overbrook's staff suffered from numerous exposures to and infections from the virus, resulting in repeated quarantines.  As a

---

[2] The Court writes primarily for the benefit of the parties and assumes familiarity with the facts pertaining to the underlying dispute between Plaintiffs and Overbrook, which are set forth in its prior opinion evaluating Overbrook's Motion to Dismiss *Divine Equality Righteous v. Overbrook Sch. for the Blind*, 2023 WL 4763994 (E.D. Pa. July 26, 2023).

result of those quarantines, the school had difficulty operating at full capacity throughout the fall of 2020 and most of 2021.

On October 6, 2021, Overbrook announced that it would require its employees to be fully vaccinated for COVID-19 by November 29, 2021.  In announcing the policy, Overbrook acknowledge that it could not "eliminate the risk of transmission" of the virus, but additionally noted that the purpose of the policy was to "take steps to mitigate the risk."

Overbrook allowed its employees to request exemptions from the vaccine mandate, either due to medical conditions or sincerely held religious beliefs.  If an employee did not provide proof of vaccination by the November 29 deadline, and had not received an exemption from the school, then the employee would be considered as "having resigned from their employment." Fifteen staff, including Plaintiffs, applied for a religious or medical exemption; each Plaintiff requested an exemption on religious, not medical grounds.

After evaluating each application for an exemption, Overbrook granted only two exemptions.  In denying the Plaintiffs' exemption requests, it sent each Plaintiff a form letter, which stated in full:

> We have carefully examined your request for Religious Exemption from COVID- 19 Vaccination for Staff at Overbrook School for the Blind ("OSB") as well as your subsequent submission in support of your request.
>
> We do not question the sincerity of your religious beliefs.  However, we have concluded that we cannot grant you an exemption because it would impose a direct threat to others and thereby present an undue hardship on OSB.  Specifically, your job responsibilities require constant close contact with other employees and with our students, many of whom are already at risk and some of whom are not eligible to be vaccinated.  While we recognize that the vaccines are not perfect, they have been extraordinarily effective in preventing serious infection and the transmission of COVID-19.  To permit you to continue in your role without having taken all possible precautions, including vaccinations, would result in a dereliction of our duties by presenting an unacceptable risk to your fellow employees

> and the students entrusted to our care.
>
> Please advise us by Wednesday, November 17, 2021, whether you intend to get vaccinated so we can make appropriate arrangements. If you assure us that you intend to begin the vaccination process by that date and take the first shot by November 22, 2021, we will provide you with a grace period beyond November 29, 2021 to become fully vaccinated. If you choose not to get vaccinated, you will be considered to have voluntarily terminated your employment on November 29, 2021, for not having met our requirements for continued employment. In the future, you will be welcome to apply for reemployment if you have been vaccinated.

None of the Plaintiffs received a vaccination, and by the end of November 2021, all were notified that, pursuant to Overbrook's warnings and letter rejecting their exemption request, they were considered to have "voluntarily terminated their employment" at the School. After termination and some back-and-forth with Overbrook regarding a possible return to employment, Plaintiffs filed the instant lawsuit.

## II.   DEFENDANT'S *DAUBERT* MOTION

During discovery, Plaintiffs introduced an expert witness, Dr. Richard Scott French, MD. Overbrook has moved to exclude French's testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *Daubert* established that district courts were meant to serve as gatekeepers, and only allow expert testimony to be heard by a jury on certain occasions. *Id.* at 597. The *Daubert* standard is codified in Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("*Paoli II*")). Rule 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Overbrook challenges French on all three fronts.

There is no need to reach all three here, however, because his proposed testimony is not the product of reliable principles and methods. To be reliable, an expert's opinions must "reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000). And, an expert's conclusions must be based on the "methods and procedures of science," not on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Therefore, the focus of reliability is "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 580. The expert must have "good grounds" for his belief. *In re Paoli R.R. Yard Litig.*, 35 F.3d at 743. The inquiry is "a flexible one." *Id.* at 742. And the bar for reliability "is not that high" because it is "lower than the merits standard of correctness." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000).

### A. Vaccine Efficacy

French claims that the various COVID-19 vaccines developed in 2021 and beyond were ineffective in preventing transmission of the virus and in reducing the resulting infection's severity. But in support of that contention, he misconstrues the exhibits upon which relies. For example, regarding transmission, French cites to an article from *The Lancet*, which concluded that:

5

> Vaccination reduces the risk of the delta variant infection and accelerates viral clearance. Nonetheless, fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in a household setting, including to fully vaccinated contacts.

According to French, the second sentence means that vaccinated individuals that catch COVID-19 are as likely to infect others as unvaccinated individuals. But as another court put it in evaluating the same argument, regarding the same *Lancet* Article:

> That's a half-truth. While vaccinated individuals that catch COVID-19 may be as likely to infect others, they are significantly less likely to be infected in the first place—as the authors emphasized in their opening sentence: "Vaccination reduces the risk of delta variant infection . . . ." A recent CDC study estimated that vaccinated individuals are three-times less likely to be infected.

*Federoff v. Geisinger Clinic*, 471 F.Supp.3d 376, 389 (M.D. Pa. 2021).

The *Lancet* Article is not the only source that French purports to rely on for a conclusion that courts have already found inconsistent with the source itself. He also cites to a Morbidity and Mortality Weekly Report (the "Outbreak Report") which details a two-week period in July 2021, where, after a super-spreader event in Massachusetts, 469 individuals who attended the event tested positive for COVID-19, 346 of which (74%) were vaccinated. But, as Judge Kasubhai from the District of Oregon has previously determined:

> Contrary to Dr. French's opinion, the Outbreak Report explicitly states that "vaccination is the most important strategy to prevent severe illness and death." The Outbreak Report continues, "[a]s population-level vaccination coverage increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases." In other words, the fact that many of the people infected at the public gathering were fully vaccinated merely reflects high vaccination rates in that geographical area at the time. The Outbreak Report concludes, "data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak." The limitation on the conclusions to be drawn from the data do not call into

6

> question the efficacy of COVID-19 vaccines. Rather, the mismatch between Dr. French's opinion and the findings and recommendations of the evidence he relies on, calls into question his capacity to comprehend scientific literature. His specious use of the Outbreak Report undermines the reliability of his methods and reasoning.

*Parker v. PeaceHealth*, 2024 WL 4993472, at *4 (D. Or. Dec. 5, 2024). Having reviewed the Outbreak Report and the *Lancet* Article independently, the undersigned agrees; French's misconstruction of the exhibits cited in his report undermine his reliability as it pertains to vaccine efficacy. *See id.*; *Federoff*, 471 F.Supp.3d at 389.

French also claims that "there is no evidence that the COVID-19 vaccines available . . . reduced the severity of" infection. In support of that contention he cites to World Health Organization guidance, which states that "[m]ost people infected with the virus will experience mild to moderate respiratory illness and recover without requiring special treatment." That does not say anything about the vaccine's efficacy in reducing the risk of serious infection. Far from it; the guidance goes on to say, "some will become seriously ill" from the virus "and require medical attention," and that the "best way to prevent and slow down transmission" is to "protect yourself and others from infection," in part by "get[ting] vaccinated."

French's misconstructions run throughout his report thus they do not reliably flow from the facts known to him nor is his methodology sound. Accordingly, Overbrook's Motion to Exclude his testimony will be granted as to his testimony regarding vaccine efficacy.

### B. Vaccine Risk

French's proposed testimony regarding any risks posed by the COVID-19 vaccine is similarly unreliable and will, thus, also be excluded. In support of that contention, he cites to a paper published in 2023 (long after Overbrook implemented its vaccine mandate), titled, "Sex-specific differences in myocardial injury incidence after COVID-19 mRNA-1273 booster

7

vaccination" (the "Myocardial Injury Paper"). In his view, the Myocardial Injury Paper "demonstrates that the COVID-19 [sic] has serious side effects at a much higher level than previously reported," namely, the incidence of myocarditis (*i.e.,* heart inflammation).

Again, French misrepresents the study upon which he purports to rely. The Myocardial Injury Paper explicitly states that although "myocardial injury was more common than previously thought," such injury was "mild and transient," and "[n]o definitive case of myocarditis was found." And the study explicitly reminds the reader that "COVID-19 associates with a substantially higher risk for myocarditis that [sic] mRNA vaccination, and myocarditis related to COVID-19 infection has shown a higher mortality than myocarditis related to mRNA vaccination. Thus, for a majority of individuals, the overall very favorable risk-benefit ratio of booster immunizations persists."

To be reliable, French's opinions needed to be based on the "methods and procedures of science," not on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. In other words, he had to have "good grounds" for his belief. *In re Paoli R.R. Yard Litig.*, 35 F.3d at 743. In that his conclusions are directly undermined by the studies he purports to rely on, French is an unreliable expert witness as to the risk of vaccination. Accordingly, his testimony must be excluded.

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Turning then to Overbrook's Motion for Summary Judgment on Plaintiffs' Claims.

#### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted). A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

### B. Religious Discrimination Claims

Plaintiffs allege that Overbrook violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*, by failing to accommodate their religious beliefs when it forced them to either receive the vaccine or leave employment.[3]

Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for

---

[3] Plaintiffs brought claims under both Title VII and the PHRA, however it is undisputed that whether an employment discrimination claim is brought under either is immaterial to the analysis, as claims brought under both statutes are decided coextensively. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

9

an employer . . . (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e–2(a). Employers must "make reasonable accommodations for their employees' religious beliefs and practices, unless doing so would result in 'undue hardship' to the employer." *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000) (citing 42 U.S.C. §§ 2000e-2(a)(1), 2000e(j)).

To establish a *prima facie* case of religious discrimination, employees must demonstrate that: they hold a sincere religious belief that conflicts with a job requirement; they informed the employer of the conflict; and, they were disciplined for failing to comply with the conflicting requirement. *Shelton*, 223 F.3d at 224; *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009). If an employee establishes that *prima facie* case, then the employer may demonstrate either that it made a good-faith effort to reasonably accommodate the religious belief; or that such an accommodation would work an undue hardship upon the employer and its business. *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010) (citations omitted).

### C. Discussion

Summary judgment on Plaintiffs' religious discrimination claims will be granted because there is no genuine dispute of material fact that accommodating Plaintiffs' religious beliefs would have placed an "undue hardship" on Overbrook's operations. *See* 42 U.S.C. §§ 2000e-2(a)(1), 2000e(j).[4]

---

[4] Overbrook does not dispute that each Plaintiff informed it of the vaccine mandate's purported conflict with their religious belief, and that each Plaintiff was fired according to said conflict. However, it does argue that Plaintiffs cannot establish a *prima facie* case, because in its view, none of the Plaintiffs hold any religious belief at all, and even if they do, those beliefs are not sincere. The questions of whether Plaintiffs' beliefs are sincere and religious in nature, however, need not be answered, because summary judgment must be granted for the reasons set forth herein.

An employer can show that accommodating an employee would present an "undue hardship," if it demonstrates that the "burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).  To demonstrate as much, an employer must show that the "accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470.  In evaluating an employer's proffered undue hardship, "courts must . . . take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer. *Id.* at 470-71 (internal quotation marks omitted).

Overbrook has produced an abundance of evidence establishing that the practical impact of accommodations for Plaintiffs would have resulted in substantial increased costs in maintaining Overbrook's business.  It is undisputed that before implementing its vaccine mandate, Overbrook required social distancing precautions, air filtration, deep cleaning procedures, testing, and masking.  Nevertheless, due to widespread infection, Overbrook was forced to undertake "repeated quarantines," resulting in "a lack of staff, and continued disruptions" which "endangered" Overbrook's "capability to perform, to remain open, and provide services to [its] students."  Overbrook has further produced experts, which Plaintiffs have not moved to exclude, detailing that these prior alternatives to vaccination were ineffective, and explaining that because "[e]ffective education of a blind child in life skills must be hand-over-hand . . . disruption in that education caused by even mild COVID cases that shut down classrooms and required quarantine served to undermine the school's ability to fulfill its mission."  *See also Antredu v. Massachusetts Dep't of Youth Servs.*, 729 F.Supp. 3d 76, 54 (D. Mass. 2024) (finding that when an employee's job requires "in-person, one-on-one interactions

with both youth, their families, and other employees," then it would be an undue hardship to approve accommodations from a COVID-19 vaccine mandate).

Plaintiffs produce no admissible evidence to the contrary. Instead, they argue that there is a material dispute as to whether the vaccine works and there is a credibility issue as to whether the vaccine was necessary. In making these arguments, the only affirmative evidence that Plaintiffs rely on is French's report. Because that report has been deemed inadmissible, it cannot be considered in deciding a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(B), (2).

Overbrook has demonstrated that accommodating Plaintiffs would have presented an undue hardship, and Plaintiffs have not identified any material facts to create genuine disputes as to that conclusion. As such, Overbrook's Motion for Summary Judgment must be granted.

An appropriate order follows.

                                       **BY THE COURT:**

                                       **S/ WENDY BEETLESTONE**

                                       **WENDY BEETLESTONE, J.**